David F. POWER, Petitioner

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent

Pension Benefit Guaranty Corporation, Intervenor

No. 97–1414.

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1998.

Decided July 10, 1998.

Steven J. Silverberg argued the cause for the petitioner.

Ann M. Boehm, Attorney, Federal Labor Relations Authority, argued the cause for the respondent. David M. Smith, Solicitor, and William R. Tobey, Deputy Solicitor, Federal Labor Relations Authority, were on brief. Pamela P. Johnson, Attorney, Federal Labor Relations Authority, entered an appearance.

Nancy S. Heermans, Counsel, Pension Benefit Guaranty Corporation, argued the cause for the intervenor. James J. Keightley, General Counsel, Terrence M. Deneen, Principal Deputy General Counsel, and Patrick S. Menasco, Attorney, Pension Benefit Guaranty Corporation, were on brief.

Before: HENDERSON, ROGERS and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LECRAFT HENDERSON, Circuit Judge:

David F. Power petitions the court to review an order of the Federal Labor Relations Authority (FLRA or Authority), *Pension Benefit Guar. Corp.*, 52 F.L.R.A. No. 132 (April 30, 1997), dismissing his wrongful termination claim against his former employer, the Pension Benefit Guaranty Corporation (PBGC). In *Pension Benefit Guar. Corp. v. FLRA,* we remanded to the FLRA to explain more adequately its decision in favor of Power. 967 F.2d 658, 670 (D.C.Cir.1992). We also directed the FLRA to compare Power to another PBGC employee whose transgressions were "at least comparable" to Power's. *Id.* For the reasons set forth below, we uphold the FLRA's order of dismissal.

**I.**

In the late 1980s Power was employed as a lawyer in the Office of General Counsel (OGC) of the PBGC and served as president of Local Chapter 211 of the National Treasury Employees Union (NTEU). As we earlier recounted, Power was fired from his position at PBGC due to "many incidents of ... insubordinate conduct." *Pension Benefit Guar. Corp.*, 967 F.2d at 660.[1] While not exhaustive, examples of Power's insubordination include his (1) repeated refusal to respond properly to a routine, supervisory request for a representative sample of his

---

1. The facts underlying this appeal have been detailed in earlier incarnations. *See Pension Benefit Guar. Corp. v. FLRA,* 967 F.2d 658, 659–65 (D.C.Cir.1992); *Pension Benefit Guar. Corp.,* 52 F.L.R.A. No. 132, slip op. at 1–9 (April 30, 1997); *Pension Benefit Guar. Corp.,* No. 3–CA– 90456, slip op. at 1–9 (July 19, 1994) (ALJ Decision); *Pension Benefit Guar. Corp.,* 47 F.L.R.A. No. 52, slip op. at 1–4 (May 7, 1993); *Pension Benefit Guar. Corp.,* 39 F.L.R.A. 905, 905–21 (1991); *Pension Benefit Guar. Corp.,* 39 F.L.R.A. 935, 935–60 (1990) (ALJ Decision).

writing, *id.* at 659–60; (2) "inexcusable" failure to follow a "concurrence matrix" used by the office to ensure the consistency of its policies, *id.* at 660 (quoting a warning memorandum sent to Power by the assistant general counsel); (3) repeated refusal to accept messages from an assistant general counsel, including one scheduling a meeting to discuss the status of Power's cases, *id.* at 660–62; (4) repeated refusal to obey a management order to return the printout of an employee survey regarding computer usage that Power had obtained and kept without the knowledge or consent of authorized agency personnel, *id.* at 661; (5) threat directed to Donald Morrison, a fellow employee who ran for vice president of Local 211, *id.*; and (6) refusal to answer questions about the Morrison threat during an investigatory interview, *id.* at 661–62. Power's conduct eventually led the assistant general counsel to conclude that discharge was appropriate. *Id.* at 662. The General Counsel agreed "after weighing Power's record of service with the agency and his 'considerable legal talents' against his 'demonstrated lack of judgment and integrity,' his 'persistent pattern of flouting supervision' and 'the need for supervisory review to ensure the consistency of agency decisions,' his 'disregard for ... [Morrison's] statutory rights,' his 'complete absence of remorse,' and his 'instigation of other employees to violate established policies.'" *Id.* The General Counsel concluded that Power "was either 'unable or unwilling to conform his behavior to [the] high standard' of conduct expected of an employee in Power's position." *Id.*

Power enlisted the assistance of the NTEU, which began an unfair labor practice claim on Power's behalf, alleging that Power had been discharged in violation of the Federal Service Labor–Management Relations Statute (FSLMRS), 5 U.S.C. § 7116(a)(1) and (a)(2) (making it "unfair labor practice" to discriminate against employee based on union affiliation), for engaging in protected activity under 5 U.S.C. § 7102 (providing each employee with "right" to affiliate with labor organization "without fear of penalty or

reprisal" and "to act for a labor organization in the capacity of a representative"). Power claimed that his refusal to provide a writing sample was a "protected activity" because he was "actively engaged in a grievance over the exact subject matter for which the writing sample was requested." Pet'r Br. at 18–19. Power also asserted that he was engaged in "protected activity" when he obtained the computer survey data, refused to return it and refused to answer questions about it because "[a]ll of these actions were undertaken solely for the purpose of representing the interest of the bargaining unit in negotiations with PBGC over ergonomic furniture." *Id.* at 19.

The Administrative Law Judge (ALJ) who heard the claim recommended dismissal. *Pension Benefit Guar. Corp.*, 39 F.L.R.A. 935, 965 (1990). The ALJ credited the testimony of PBGC managers who stated that union activity played no part in their decision to terminate Power. The ALJ concluded that Power had failed to establish his allegations by a preponderance of the evidence. *Id.* at 960–65. The FLRA reversed, concluding that PBGC had wrongfully discharged Power because of his union affiliation and activities. *Pension Benefit Guar. Corp.*, 39 F.L.R.A. 905, 931 (1991).

PBGC appealed and we reversed, remanding the matter to the FLRA for further consideration. We began by noting:

> We need not decide whether the FLRA made out a *prima facie* case [under the unlawful discrimination framework set forth in *Letterkenny Army Depot*, 35 F.L.R.A. 113 (1990)] because we believe that PBGC demonstrated that it would have fired Power absent ... union animus. The FLRA conceded "that Power engaged in insubordinate acts," *see* 39 F.L.R.A. at 930, and implicit in this concession is a recognition that PBGC had a "legitimate justification for its action." *Letterkenny*, 35 F.L.R.A. at 118.

*Pension Benefit Guar. Corp.*, 967 F.2d at 666. Under the *Letterkenny* framework,[2] we

2. "[T]he FLRA General Counsel makes out a prima facie case of discrimination [under *Letterkenny*] if it shows by a preponderance of the

evidence that: '(1) the employee against whom the alleged discriminatory action was taken was engaged in protected activity; and (2) such activ-

next examined whether PBGC demonstrated—as it must—that it would have discharged Power "even in the absence of protected activity." *Letterkenny*, 35 F.L.R.A. at 118. We noted that the analysis required a comparison of the PBGC punishments meted out to other similarly situated employees. *Pension Benefit Guar. Corp.*, 967 F.2d at 666. We determined, however, that the FLRA's analysis of the "similarly situated status of the employees being compared" was "inadequately explained." *Id.* at 667. Specifically, we noted that the FLRA's comparison of Power to two other employees, employee #1 and employee #6, was insufficiently explained.[3] *Id.* at 668–70. We specifically "reject[ed] the FLRA's finding that the conduct of employee #1 and of Power was 'at least comparable' as unsupported by substantial evidence on the record as a whole." *Id.* at 667 (citing 5 U.S.C. § 7123(c); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).[4] With respect to employee #6, we "question[ed] the FLRA's contention ... that employee #6 is not comparable" in that employee #6 was also an OGC lawyer, he "repeatedly dealt directly with PBGC's Office of the Executive Director, urging it to take positions that had not been approved by the General Counsel and were in some instances contrary to the General Counsel's positions" and he was given the choice to resign or be terminated. *Id.* at 669. We explained:

> We view [employee #6's] transgressions as 'at least comparable' to Power's failure to follow the concurrence matrix. We further note that employee #6 did not engage in the multiple types of insubordination Power did. That PBGC did not offer employee #6 a suspension but instead sought his removal may be further evidence that Power did not receive disparate treatment. In any event, the FLRA made no mention of employee #6, an employee whose situation, we conclude, was in some respects analogous to Power's.

*Id.* at 669–70. Accordingly, we concluded that "the FLRA failed to define 'similarly situated' in conducting its disparate treatment analysis" and remanded "for proceedings not inconsistent with this opinion, including the direction that the FLRA consider employee #6 in conducting its disparate treatment analysis." *Id.* at 670. Following our directive, on remand the FLRA articulated its criteria for determining whether an employee has been treated differently from similarly situated employees:

> In making such a determination, the Authority considers the totality of the facts and circumstances of the case. The Au-

---

ity was a motivating factor in the agency's treatment of the employee in connection with hiring, tenure, promotion, or other conditions of employment.'" *Pension Benefit Guar. Corp.*, 967 F.2d at 666 (quoting *Letterkenny*, 35 F.L.R.A. at 118). Once the *prima facie* showing is made, the employer can establish that (1) there was a "legitimate justification" for the action and (2) the same action would have been taken even in the absence of protected activity. *Letterkenny*, 35 F.L.R.A. at 118.

3. In addition, we "question[ed] the FLRA's attempt to distinguish the case of employee #8 ..., a GS–12 auditor discharged for insubordination, on the ground that he, unlike Power, received progressive discipline. Power did receive numerous warnings and had more than ample notice that his conduct was unacceptable." *Pension Benefit Guar. Corp.*, 967 F.2d at 670 n. 15. We were "also troubled by the FLRA's reliance [in its disparate treatment analysis] on PBGC's failure to discharge three of its employees for physical assaults and obscene gestures" who "were neither lawyers nor OGC employees." *Id.* at 668–69.

4. We held:

> The record demonstrates that, unlike employee #1 who had received no warnings before the imposition of the disciplinary sanction, Power had received numerous verbal warnings. Nevertheless, Power continued his insubordinate conduct. Indeed, the record further indicates that even after the investigatory interview, at which time Power had knowledge that his conduct was being closely scrutinized, he continued to refuse to follow the concurrence matrix and he continued to delete CEO messages without reading them. The FLRA's decision ignores this critical difference between employee #1's conduct and Power's conduct.

*Pension Benefit Guar. Corp.*, 967 F.2d at 667. Moreover, we noted that employee #1's supervisors "retained sufficient confidence in him to grant him a second chance" whereas "two management officials who the FLRA concedes did not have a union animus, testified that Power could not return to the office as an effective employee." *Id.* at 668.

thority compares, among other things, the consistency of treatment received by an employee who engaged in protected activity with that received by other employees: (1) from the same supervisor, and (2) in the workplace as a whole.

Moreover, in determining whether employees are similarly situated in circumstances where an adverse or disciplinary action was taken against an employee who engaged in protected activity and against one who did not, we find that it is relevant to compare: (1) the nature of the misconduct; (2) the positions the employees occupied; (3) the employees' past disciplinary records; and (4) the extent to which employees were previously warned that their conduct may result in discipline. We also find that it is appropriate to examine the elements listed in *Douglas v. Veterans Administration,* 5 [M.S.P.B.] 280, 305–06 (1981) (*Douglas*) that are relevant to a particular adverse action decision and the extent to which a respondent consistently relied on the *Douglas* elements, or any other factors, when imposing adverse or disciplinary actions. We note that the weight given to the above-noted factors may vary with the circumstances presented in a specific case.

*Pension Benefit Guar. Corp.,* 47 F.L.R.A. No. 52, slip op. at 5 (May 7, 1993) (internal citations omitted). The FLRA, however, subsequently sent the case back to the ALJ because it found the record inadequate for it to make the specific determinations with respect to Power required by this court. *Id.* at 5–7. The FLRA directed the ALJ to adduce "additional evidence to decide whether Power was similarly situated to Employees Nos. 1, 6, 7, 9 and/or 10 and, based on the evidence ... determine ... whether Power was subject to disparate treatment." *Id.* at 6–7.

On remand, the ALJ conducted a one-day hearing during which "all parties were afforded the full opportunity to be heard, to examine and cross-examine witnesses, and to introduce evidence bearing on the issues set forth in the [FLRA's] remand." *Pension Benefit Guar. Corp.,* No. 3–CA–90456, slip

op. at 4 (July 19, 1994). "Upon the basis of the entire record, including ... observation of the witnesses and their demeanor," the ALJ concluded, once again, that "I cannot find that Mr. Power was subjected to disparate treatment." *Id.* at 4, 11. Specifically, the ALJ found that employee #6 and Power "were similarly situated," and "[i]nasmuch as both Employee No. 6 and Mr. Power were given like penalties for the same indiscretions, I find that Mr. Power was not treated differently than Employee No. 6." *Id.* at 10. In addition, "[w]ith respect to Employee No. 1, in agreement with the Circuit Court of Appeals for the District of Columbia, I find that Employee No. 1 and Mr. Power were not similarly situated." *Id.* And finally,

[T]urning to Employee [sic] Nos. 7, 9 and 10 ... I cannot find that they are similarly situated to Mr. Power. In reaching this conclusion I note, among other things, the fact that they are not lawyers, they do not work in the same department under the same supervision, the type of misconduct they were involved in, i.e., fighting as opposed to insubordination, the respective grades held by the employees and Mr. Power, and the responsibilities imposed upon Mr. Power as an independent operator representing Respondent in the legal arena.

*Id.* at 11. The FLRA affirmed the ALJ:

[W]e find Power similarly situated and treated comparably to Employees Nos. 6 and 8,[5] who were also separated from Federal service. As to Employee No. 1, although Power and Employee No. 1 were both attorneys and engaged in somewhat comparable misconduct, we find that significant differences between them rebuts [sic] the conclusion that Power was disparately treated. We also find that Power was not similarly situated to Employees Nos. 7, 9, and 10 who, like Employee No. 1, received lesser sanctions than Power. We therefore find that Power was not treated disparately by PBGC, and that PBGC would have taken the same action even in the absence of Power's protected activity.

---

5. While the ALJ did not adduce further evidence with respect to Employee No. 8, the FLRA deter-

mined that the record was sufficient to allow it to again compare Employee No. 8 with Power.

*Pension Benefit Guar. Corp.*, 52 F.L.R.A., slip op. at 27–28.

Power now petitions this Court to reverse the FLRA's April 30, 1997 decision. He requests that the PBGC be ordered to offer him immediate reinstatement to his former (or a comparable) position with full backpay and interest and that it be instructed to expunge from its records all references to his removal, to post a notice to all employees admitting its error and to pay attorney's fees.

Power also claims that, in any event, the FLRA's decision should be set aside because, on remand, one of the two voting FLRA panel members, Donald S. Wasserman, should have recused himself based on an incident with Power when both were employed by the American Federation of State, County and Municipal Employees, AFL–CIO (AFSCME). After PBGC terminated Power, he secured a position with AFSCME as a labor economist in the research department. Power Decl. ¶ 3. At that time, Wasserman was the director of research and collective bargaining services at AFSCME. Wasserman Decl. ¶ 3. Power claims that the incident occurred during a meeting in Wasserman's office while they were discussing a letter that Power drafted. He claims that Wasserman criticized the letter and then reacted angrily to Power's explanation which Wasserman viewed as condescending, disrespectful and insubordinate. Power Decl. ¶¶ 15, 16. Soon after the meeting he was informed that his employment would not continue past the probationary period and he now alleges Wasserman had a role in that termination decision. Power Decl. ¶¶ 19–20. For his part, Wasserman declares that he "played no part, directly or indirectly, in the decision to terminate" Power, that his decision as an FLRA member "was based solely upon my consideration of the facts of the applicable law" and that the earlier incident "in no way affected my decision in the case, nor could it have" because he was unaware "that the employee with whom I met briefly while I was at AFSCME was the same individual." Wasserman Decl. ¶¶ 4–6.

## II.

We affirm the FLRA's findings of fact "if supported by substantial evidence on the record considered as a whole." 5 U.S.C. § 7123(c); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We will set aside an FLRA order only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 7123(c), 706(2)(A); *see also Overseas Educ. Ass'n, Inc. v. FLRA*, 858 F.2d 769, 771–72 (D.C.Cir.1988).

█ Power again advances several arguments, none of which has merit. First, we reject both of Power's "protected activity" claims under the FSLMRS. Pet'r Br. at 18–19. With respect to his repeated refusals to provide a writing sample, Power's pending grievance "over the exact subject matter for which the writing sample was requested," *id.* at 19, does not immunize him from responding to a supervisor's good faith request for rating material. Moreover, Power's assertion that he merely wished to be judged on his entire body of writing over the rating period does not explain his insubordinate behavior in submitting over 2,000 pages of unstapled, uncollated pages, many of which were totally irrelevant, including other individuals' court filings and LEXIS printouts. Power's strained argument—that he was engaged in a statutorily "protected activity" by tardily submitting nonresponsive documents in response to his supervisor's repeated and legitimate requests for writing samples—is without merit. We also reject Power's claim that his refusal to obey the management order to return the computer usage surveys was a statutorily "protected activity." We agree with the FLRA that "the information was ... PBGC's property that Power obtained from an unauthorized source without PBGC's knowledge or consent" and that Power's "first obligation [was] to comply with [his] supervisory order[s], reserving any complaints or grievances for a later time." *Pension Benefit Guar. Corp.*, 52 F.L.R.A. at 16–17.[6]

---

**6.** Power invokes for support the decision in *Unit-* *ed States Air Force Logistics Command, Tinker Air*

Power also claims that the FLRA's dismissal of his wrongful termination claim is "arbitrary, irrational, unsupported by substantial evidence on the record considered as a whole, and is otherwise not in accordance with law." Pet'r Br. at 20. Notwithstanding his repeated efforts to re-write the facts of this case, characterizing his insubordination as "minor and inadvertent" and "mistaken violations of office protocol," *id.* at 40, 32, we have already concluded that Power engaged in "many incidents of insubordinate conduct" and "multiple types of insubordination." *Pension Benefit Guar. Corp.*, 967 F.2d at 660, 670. The facts underlying Power's termination are the same today as they were when this Court first heard the matter. Now, as then, the FLRA's conclusion that PBGC "had a legitimate justification for its action," *id.* at 666 (internal quotations omitted), is supported by substantial evidence.

■ As a result, the question on remand was simply whether Power would have been terminated even in the absence of protected activity. After comparing Power's circumstances to those of other disciplined employees, both the ALJ and the FLRA concluded that Power had not been treated disparately. While Power uses selective facts from the record in an attempt to recast his misconduct in a more favorable light, his attempts fail to demonstrate that the ALJ's and FLRA's findings lack substantial support in the record as a whole. Indeed, even if the case

were closer, we would nonetheless affirm the FLRA because its findings, supported by substantial evidence, "may not be displaced on review even if the court might have reached a different result had the matter been before it *de novo.*" *LCF, Inc. v. NLRB*, 129 F.3d 1276, 1281 (D.C.Cir.1997) (internal citations omitted).

Power next argues that the FLRA erroneously adopted and applied the factors outlined in *Douglas v. Veterans Admin.*, 5 M.S.P.B. 280, 305–06 (1981). Specifically, Power contends that the *Douglas* factors apply only to Merit Systems Protection Board cases and that the FLRA could not adopt those factors as its own because they had been developed by another administrative body. As we specifically noted in *Pension Benefit Guar. Corp. v. FLRA*, however, "[i]t is, of course, for the FLRA to determine in the first instance what factors are relevant in deciding whether employees are similarly situated." 967 F.2d at 668. We then discussed in detail numerous *Douglas* factors to be considered after declaring that "many factors may be relevant in determining an appropriate sanction." *Id.*[7]

■ Finally, Power's bias claim regarding FLRA member Wasserman is meritless. We will set aside an official's decision not to recuse "only where he has 'demonstrably made up [his] mind about important and specific factual questions and [is] impervious

Force Base, Oklahoma City and AFGE, which overturned the management's discipline of a union representative who was detained by security officers after refusing to leave a work area where he was attempting "to personally serve copies of unfair labor practice charges filed by the Union on Activity supervisors who were named in the charges." 34 F.L.R.A. 385, 386 (1990). We find the decision inapposite because, as noted above, Power's insubordinate conduct was neither union-related nor statutorily protected. Nor was it "grounded" or "rooted" in any provision of a collective bargaining agreement. *See NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 831–32, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). Moreover, *United States Air Force* reaffirms "[m]anagement's right ... to discipline a union representative for activities which 'are not specifically on behalf of the exclusive representative or which exceed the boundaries of protected activity such as flagrant misconduct.'" *Id.* at 388–89 (quoting *Long Beach Naval Shipyard, Long Beach, Calif.*, 25 F.L.R.A. 1002, 1005 (1987)).

Finally, as we have repeatedly recognized, "[e]ngaging in union activities does not shield an employee from being fired." *Avecor, Inc. v. NLRB*, 931 F.2d 924, 928 (D.C.Cir.1991).

7. Power also claims that the FLRA erroneously refused to consider more "evidence" on remand. We reject this claim as well. On remand, the ALJ and the FLRA followed our narrow instructions, which did not include reopening the entire record. Power has had more than a "fair opportunity to develop and present" his case and the "strong public interest in bringing litigation to a close," *INS v. Abudu*, 485 U.S. 94, 107, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988), was—and is—manifest in this matter, which has now been before the ALJ twice, before the FLRA three times and before us twice. Moreover, "[r]eopening an evidentiary hearing is a matter of agency discretion, and is reserved for extraordinary circumstances." *Cities of Campbell v. FERC*, 770 F.2d 1180, 1191 (D.C.Cir.1985) (citation omitted).

to contrary evidence.'" *Metropolitan Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (quoting *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1209 (D.C.Cir.1980)). No such showing has been made here. Nothing in Power's declaration regarding his brief exchange with Wasserman suggests—much less establishes—that Wasserman had "a fixed opinion—'a closed mind on the merits of the case.'" *Throckmorton v. NTSB*, 963 F.2d 441, 445 (D.C.Cir. 1992) (quoting *United States v. Haldeman*, 559 F.2d 31, 136 (D.C.Cir.1976)).

▮ Even if Power's argument had merit, he would be precluded from raising it now because "[c]laims of bias must 'be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist.'" *Pharaon v. Board of Governors of the Fed. Reserve Sys.*, 135 F.3d 148, 155 (D.C.Cir.1998) (quoting *Marcus v. Director, Office of Workers' Compensation Programs*, 548 F.2d 1044, 1051 (D.C.Cir. 1976) (footnotes omitted)). Indeed, the Federal Labor Relations Act provides that "no objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances." 5 U.S.C. § 7123(c); *see also United States Dep't of Commerce v. FLRA*, 7 F.3d 243, 245 (D.C.Cir.1993). It is undisputed that Power failed to apprise the FLRA of Wasserman's potential bias when Power first became aware of Wasserman's participation. At oral argument, Power's counsel conceded that the reason no objection was made was that Power was "embarrassed" by the episode and hoped for a favorable decision, thus obviating the need to reveal how his AFSCME employment had ended. We have specifically instructed that in similar circumstances:

> [i]t will not do for a claimant to suppress his misgivings [regarding bias] while waiting anxiously to see whether the decision goes in his favor. A contrary rule would only countenance and encourage unacceptable inefficiency in the administrative process. The APA-mandated procedures afford every party ample opportunity to enforce and preserve its due process rights. Under the present circumstances, however, petitioner must be deemed to have waived his claim.

*Marcus*, 548 F.2d at 1051. We therefore have little difficulty concluding both that Power's embarrassment regarding one of his workplace conflicts does not constitute an "extraordinary circumstance" justifying his failure to object below, 5 U.S.C. § 7123(c), and that he "must be deemed to have waived his claim" based on his admitted "suppress[ion of] his misgivings while waiting anxiously to see whether the decision [would] go[ ] in his favor," *Marcus*, 548 F.2d at 1051.[8]

### III.

As did the ALJ and the FLRA below, we conclude that Power's termination resulted

---

8. Power attempts to expand our decision in *Jenkins v. Sterlacci*, 849 F.2d 627 (D.C.Cir.1988), claiming that "[i]n fact, *Jenkins* provides in the case of actual bias there can be no waiver of the bias claim, and thus Power had no obligation to raise it before the Authority." Pet'r Reply Br. at 23. But *Jenkins*, which involved a court-appointed special master, turned on Canon 3.D. of the Code of Judicial Conduct, which expressly provides that disqualification for personal bias is not waivable for those covered by the Code. As noted above, by contrast, Power was expressly bound by statute to raise his objection before the FLRA. *See* 5 U.S.C. § 7123(c); *see also* Administrative Procedure Act § 7(b), 5 U.S.C. § 556(b) ("On the filing in good faith of a *timely* and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.") (emphasis added). Moreover, in decisions both preceding and subsequent to *Jenkins*, we have held that in administrative agency proceedings, an actual bias claim can be waived. In *Pharaon v. Board of Governors of Fed. Reserve Sys.*, the petitioner claimed that the ALJ was biased, "relying chiefly on a statement made by the ALJ" in ruling against him. 135 F.3d 148, 155 (D.C.Cir.1998). We held that because the petitioner was "[a]ware of the ALJ's alleged bias when he appealed the [ALJ's] recommended decision" but "failed to raise the issue or argue that the case should be remanded to a different ALJ," he "thus waived his principal ground for asserting bias" and could not first raise the issue on appeal. *Id.; see also Marcus v. Director, Office of Workers' Compensation Programs*, 548 F.2d 1044, 1051, 1050 (D.C.Cir.1976) ("petitioner must be deemed to have waived his claim" of ALJ's bias because he "wait[ed] until after the initial adverse decision [of the ALJ] to raise the[ ] allegations" that "the ALJ 'demonstrated personal bias, religious bias, and bias based upon the nativity of appellant'").

not from anti-union animus but from his "many incidents of ... insubordinate conduct." *Pension Benefit Guar. Corp.*, 967 F.2d at 660. Accordingly, the petition for review is

*Denied.*