# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2771

_____

Guy A. Edwards,

               Petitioner,

v.

Federal Aviation Administration,

               Respondent.

\*
\*
\*
\*
\*  Petition for Review of an
\*  Order from the Federal
\*  Aviation Administration.
\*
\*
\*

_____

Submitted:  March 5, 2004
Filed:  May 7, 2004

_____

Before BYE, McMILLIAN, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge

We are called upon to answer the novel question whether, under federal aviation regulations, a licensed heliport is an airport, ever mindful of elementary physics–what goes up, must come down. We also realize that, although the western skies are usually friendly, moored balloons drifting near a heliport at the Sturgis motorcycle rally can be dangerous.

Guy Edwards (Edwards) petitions for review of an order of the Administrator of the Federal Aviation Administration (FAA) denying Edwards's appeal from an administrative law judge's (ALJ) decision assessing a $5,000 civil penalty on Edwards for violating 14 C.F.R. §§ 101.7(a) and 101.13(a)(4) (2003), by operating

a moored balloon near a heliport, and creating a hazard to persons and property. We deny Edwards's petition.

We travel to the western edge of our circuit where each year, in early August, the city of Sturgis, South Dakota, hosts a large gathering of motorcycle enthusiasts, affectionately called "Sturgis." Media reports place attendance at "Sturgis" as high as 650,000 people in 2000. The motorcycle rally brings the city a remarkable volume of commerce for its local businesses. This commerce stimulates souvenir and tee-shirt sales, vending, and leasing of vending retail space. Edwards owns several such businesses, including a Best Western Hotel, a restaurant/lounge, and the Sturgis Inn Shirt Company. The influx of bikers into Sturgis also creates unaccustomed congestion for the residents, including bumper-to-bumper street traffic and helicopter overflights.

Beginning in 1995, Rapid Helicopter (Rapid) conducted sightseeing and aerial photography flights during the annual motorcycle rallies from a location near Edwards's property. Edwards believed the flights were unsafe and damaged his enterprise. In 1998, in an attempt to halt Rapid's helicopter business, Edwards purchased the land on which Rapid operated. Undeterred, Rapid leased another property directly across the street from Edwards's property. Rapid sought and obtained a favorable airspace determination for the new site from the FAA, as well as an airport operating license from the South Dakota Aeronautics Commission. Nevertheless, Edwards believed the new Rapid helicopter operation was sited in violation of federal law and was operating without city approval.

In late summer of 1999, with the approach of the August biker season, Edwards moored two large advertising balloons on his property. This action, Edwards believed, would ameliorate the helicopter problem. With the balloons flying, two FAA aviation safety inspectors visited Edwards's property, where they advised Edwards he was violating FAA regulations. While on site, the inspectors

observed two large balloons moored by 200-foot lines, approximately 250 feet from the helicopter launching pad. Both inspectors believed the balloons posed a hazard to the helicopters. Nevertheless, Edwards denied violating any regulations, and stated he did not care about the regulations.

Edwards received numerous other warnings from FAA officials, both before and during the Sturgis rally, advising Edwards his balloons were illegal. Edwards, however, believed he was justified in flying his balloons because (1) Edwards and his balloons were there first; (2) Edwards had invested $500,000 in his property, which would be lost if the helicopter flights occurred, because the helicopters blew shirts off his racks, frightened his vendors, and distributed dust all over his enterprise; and (3) Rapid was not a safe operator and Edwards family, staff, and vendors were in danger.

On August 9, 1999, one of the safety inspectors returned to the site, because the FAA received a complaint that strong winds were causing Edwards's balloons to drift across the street, creating a traffic hazard. When the inspector arrived at Edwards's business, the balloons had been taken down. Edwards admitted the strong winds had caused his balloons to fall, and that one balloon had ruptured when it hit the ground. Although Edwards admitted he did not feel safe flying the balloons, the balloons kept the helicopters from flying directly over his business, and thereby avoided endangering him, his employees, and his family.

Two days later a third FAA inspector arrived on Edwards's property. The inspector testified Edwards said he would do whatever it took to protect his interests and his property, even if it meant shooting the windows out of the helicopters. Because of this threat, an FBI agent visited Edwards on August 13 to investigate. The agent noticed one balloon flying, and seized the balloon as evidence.

In March 2000, the FAA filed a complaint with the Department of Transportation, seeking assessment of a $5,000 civil penalty for Edwards's alleged

violations of 14 C.F.R. § 101.7(a) (no person may operate a moored balloon in a manner that creates a hazard to other people or property), and 14 C.F.R. § 101.13(a)(4) (no person may operate a moored balloon within five miles of the boundary of an airport).[1]  An ALJ held a hearing on the complaint.

Initially, the ALJ ruled, for purposes of the proceeding, the heliport was lawfully and officially approved.  The ALJ based his decision on evidence showing the heliport received an operating license from the South Dakota Aeronautics Commission and an airspace determination from the FAA, and Edwards lost a related nuisance claim in state court.  The ALJ granted the FAA's motion in limine to consider moot and irrelevant Edwards's challenge to the legal existence of the airport. The ALJ further found the heliport was an "airport" within the regulatory definition of 14 C.F.R. § 1.1 (2003) (an airport is an area of land or water used or intended to be used for the landing and taking off of aircraft).  The ALJ then concluded Edwards violated section 101.13(a)(4) by operating a moored balloon within five miles of the heliport, and also violated section 101.7(a), because the evidence showed the balloons created a hazard to people and property.  Finally, the ALJ decided a $5,000 fine was appropriate.  The FAA upheld the ALJ's decision, finding, as relevant, Edwards's defiance of the authorities and the regulations was not justified by his belief that the heliport was improperly authorized.

In his timely petition to this court, see 49 U.S.C. § 46110(a), Edwards argues (1) because the heliport was not properly sited and authorized, with clearly defined boundaries, there was no "airport" or "airport boundary," and thus no violation of section 101.13(a)(4); and (2) his balloons did not cause a hazard to people or

---

[1]The regulations apply to moored balloons with a diameter of more than six feet and a gas capacity of more than 115 cubic feet. (14 C.F.R. § 101.1(a)(1)). Edwards has not disputed that his balloons were subject to the regulations.

property, but only to the illegally operated helicopters, and so he did not violate section 101.7(a).

We review the FAA's decision to determine whether it was arbitrary, capricious, an abuse of discretion, or contrary to law, see Friends of Richards-Gebaur Airport v. FAA, 251 F.3d 1178, 1184-85 (8th Cir. 2001), giving substantial deference to the FAA's interpretation of its statutes and regulations, see Watkins v. Nat'l Transp. Safety Bd., 178 F.3d 959, 961 (8th Cir. 1999).

Edwards claims a licensed heliport is not an airport. This interesting controversy turns on the meaning of the word "airport" as used in 14 C.F.R. § 1.1: *"Airport* means an area of land or water that is used or intended to be used for the landing and takeoff of aircraft, and includes its buildings and facilities, if any."[2] Although we find no cases addressing section 1.1's definition of "airport," we conclude the ALJ reasonably determined this heliport was an airport within the meaning of the regulation, given the evidence that the site was being used regularly for the take-off and landing of helicopters, with FAA and state approval. Cf. N.W. Airlines, Inc. v. Goldschmidt, 645 F.2d 1309, 1315 (8th Cir. 1981) (where the court found little case law on point, noting the agency's construction of a statute is entitled to substantial deference, and finding no indication the agency's interpretation was wrong). Furthermore, deference to an administrative agency's reasonable construction of a statute is appropriate where the agency is entrusted with the administration of the statute. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984). Deferring to a federal agency's interpretation of a statute is based, in part, on the expertise it possesses in implementing federal policy in the general subject area. See Aluminum Co. of Am. v. Central Lincoln Peoples' Util. Dist., 467 U.S. 380, 389-90 (1984). The plain language of the aviation regulation

---

[2]*Aircraft* means a device that is used or intended to be used for flight in the air. 14 C.F.R. § 1.1.

does not require that the airport comply with any licensing requirements. Rather, the language is straightforward and functional: if land is used for, or is intended to be used for, the landing and taking off of aircraft, then that area of land is an airport.

In some circumstances, a lack of authorization or knowledge of an "airport" might complicate and restrict an airport's boundaries for purposes of the five-mile protected area required around an airport. This is not that case. In the instant case, Edwards cannot deny he knew the location of the intended helicopter operations, and there is no question Edwards's balloons were operated within five miles of the heliport boundaries–directly across the street, approximately 250 feet from the helipad.

We also find meritless Edwards's argument his balloons did not create a hazard to other people or property, because the balloons only endangered the helicopters. See 14 C.F.R. § 101.7(a). ("No person may operate any moored balloon . . . in a manner that creates a hazard to other persons, or their property.") Helicopters are property, helicopters carry people, and a crashing helicopter would certainly pose a danger to people and property in its path.

The FAA, using clear and reasonable language, defined "airport," for the purpose of FAA safety regulations, as the place where a helicopter goes up and comes down. Edwards asks us to adopt a different and creative definition of the word airport, a definition whose transparent purpose is to protect Edwards's personal commercial interests. We decline to do so.

Accordingly, we conclude the FAA's decision was not arbitrary or capricious, and we deny Edwards's petition.

_____